# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos.  08-2363/2434

_____

| | |
|---|---|
| Brian Pendleton, | * |
| | * |
| Plaintiff – Appellant/ | * |
| Cross –Appellee, | * |
| | *  Appeals from the United States |
| v. | *  District Court for the |
| | *  Eastern District of Missouri. |
| QuikTrip Corporation, | * |
| | * |
| Defendant – Appellee/ | * |
| Cross – Appellant. | * |

_____

Submitted: April 13, 2009
Filed:  June 8, 2009

_____

Before MURPHY, HANSEN, and BYE, Circuit Judges.

_____

MURPHY, Circuit Judge

Brian Pendleton brought this action against QuikTrip pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), alleging that QuikTrip had terminated his employment to prevent him from receiving benefits under the company's severance and stock plans.  QuikTrip moved for summary judgment, and the district court granted the motion after concluding that Pendleton was not entitled to any benefits under the plans.  The district court also denied QuikTrip's motion for attorney fees.  Both parties appeal.  We affirm.

Brian Pendleton worked at QuikTrip from 1989 until his termination in 2004. He held several positions with the company, including his last post as a director of real estate. In June 2004, Pendleton told his direct supervisor, Jeff Thoene, that he intended to leave QuikTrip to pursue a career in private real estate development. Thoene informed his boss, James Marchesano, about Pendleton's plan to leave. Marchesano then called Pendleton and asked him to reconsider. Although Pendleton indicated that he did not want to stay at QuikTrip permanently, he agreed to postpone his departure to assist with his replacement's transition. Pendleton recommended to Thoene that the new real estate director be someone with a background in real estate and store development, rather than an insider who lacked such experience.

On July 23, 2004, Pendleton learned that his replacement would be Rodney Loyd, a QuikTrip employee from the operations group at corporate headquarters. That same day Pendleton held a meeting with his staff regarding the transition. After announcing at the meeting that Loyd would succeed him, Pendleton then made disparaging comments about Loyd and the company's management. According to a staff member who was present, Pendleton said that the selection of Loyd demonstrated that QuikTrip "promote[s] operations people into positions where they don't know what they're doing." Pendleton also accused management of developing inbreeds and referred to Loyd as a "twinkie bar" whose "only real estate experience was probably buying a house, but not doing a sophisticated, complicated deal."

Thoene and Marchesano quickly learned of Pendleton's remarks at the staff meeting. Thoene recommended to Marchesano that Pendleton be terminated immediately "because he was just going to undermine [Loyd's] ability to be able to lead this group going forward." QuikTrip's president, Chet Cadieux, authorized Marchesano to fire Pendleton if the comments were actually attributable to him. Thoene and Marchesano met with Pendleton, who did not deny making the statements, offer any excuses for his behavior, or apologize for his actions.

As a result Thoene and Marchesano gave Pendleton a written dismissal notice which stated that his termination was for "gross misconduct" and "insubordination." Marchesano also told Pendleton that his termination was "for cause." Pendleton later testified that he was not aware of any facts suggesting that Marchesano and Thoene acted in bad faith in their decision to terminate him. Pendleton contends that Thoene and Marchesano's stated reasons for his termination were pretextual and that he was actually fired so that QuikTrip could avoid paying him benefits under the company's severance and stock plans.

QuikTrip maintained an ERISA governed severance plan at the time that Pendleton was terminated. The plan had undergone substantial revisions. The original plan stated that "[s]everance pay based on tenure with QuikTrip will be provided when a full-time employee terminates employment for any reason with the exception of gross misconduct." A revised plan was in place at the time of Pendleton's termination, however, which narrowed the availability of severance pay. The policy section of the revised plan states that its primary purpose is to "accommodate position eliminations/lay-offs." The policy section also provides that "[s]everance pay based on tenure with QuikTrip may . . . be provided to full time employees who are physically unable to perform their job duties, meet the Rule of 75, or upon death,"[1] but states that employees terminated for cause are ineligible for severance. The procedure section of the plan states that severance packages for directors, such as Pendleton, "will be negotiated" but indicates that a director must meet one of the criteria in the policy section, such as death or disability, even to qualify for negotiations.

---

[1] The rule of 75 is a formula used by QuikTrip to determine the availability of benefits. To qualify, an employee's age combined with years of service must equal 75. For example, an employee who is 53 years of age and has worked at QuikTrip for 22 years would qualify (22 + 53 = 75).

Several documents were circulated to QuikTrip employees in relation to the revised severance plan, including a memorandum by QuikTrip's president which described the new severance plan as "a significant change" that would reduce benefits. Nevertheless, an email written by the director of human resources stated that there was "no change" for directors in the revised plan. She later testified that her email only clarified that the amount of severance would not change but that it did not indicate that all directors still qualified for severance pay.

QuikTrip also maintained a stock plan at the time of Pendleton's termination. In pertinent part, the stock plan states:

> In the event that the relationship between the Participant and the Company is terminated, either voluntarily or involuntarily . . . the Company shall have the irrevocable options, exercisable within one hundred eighty (180) days after the date of the payment of the final cash severance benefit by the payment of cash, to purchase the shares of stock of the Company owned by the participant at its book value of the stock as of the end of the last month preceding the date of the payment of the final cash severance benefit . . . .

(R. at 412). While the stock plan provides QuikTrip with the right to quickly repurchase its stock within a 180 day period after termination, the plan allows specific employees to slow the speed at which QuikTrip can repurchase its stock. Terminated employees with 20 years or more with the company or employees who "retire" from the company may retain ownership of some QuikTrip stock for more than 180 days. An employee "retires" from the company if he satisfies the rule of 75, becomes permanently disabled, or the board of directors specially places him in this category.

Pendleton contends that QuikTrip actually gave other real estate directors generous severance payments and stock benefits when they left the company. Around

-4-

the time of Pendleton's termination, three other real estate directors, who voluntarily left the company and did not meet any of the plans' specific requirements, received severance and stock benefits. QuikTrip maintains that Pendleton did not receive the same benefits as the other directors because he was terminated for cause and did not fulfill his promise to aid in his successor's transition. In August, 2004, QuikTrip offered Pendleton eight weeks of severance pay, which he refused to accept. Then in December, 2004, QuikTrip attempted to repurchase Pendleton's 4,517 shares of its stock under the terms of the stock plan. Pendleton refused to tender his shares. Prior to the initiation of this action, QuikTrip also paid Pendleton's final salary, outstanding bonuses, and related benefits.

Pendleton filed a complaint in district court alleging that QuikTrip had terminated him to interfere with his rights to benefits under both the severance and stock plans, in violation of § 510 of ERISA, 29 U.S.C. § 1140. The district court granted QuikTrip's motion for summary judgment after concluding that Pendleton was not entitled to any benefits under QuikTrip's plans. Pendleton appeals, contending that the district court erred in granting summary judgment because genuine issues of material facts exist as to Pendleton's benefits under the company plans and QuikTrip's actual reasons for terminating Pendleton.

We review a district court's grant of summary judgment de novo. Fischer v. Anderson Corp., 483 F.3d 553, 556 (8th Cir. 2007). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Summary judgment should be granted if any essential element of the prima facie case is not sufficiently supported by specific facts to raise genuine issues for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Section 510 of ERISA makes it unlawful for an employer to discharge an ERISA plan participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. To prevail under § 510, Pendleton must show that QuikTrip "had a specific intent to interfere with [his] benefits, but that may be shown by circumstantial evidence." Register v. Honeywell Fed. Mfg. &Tech., LLC, 397 F.3d 1130, 1137 (8th Cir. 2005). Claims brought under § 510 are analyzed under the McDonnell Douglas burden shifting framework. Fitzgerald v. Action Inc., 521 F.3d 867, 871 (8th Cir. 2008). Under this analysis, if plaintiff makes a prima facie case of discrimination, then the burden shifts to the defendant to articulate a nondiscriminatory reason for the termination. Id. If the defendant does so, then the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are actually pretextual. Id.

Pendleton's ability to prove a prima facie case of discrimination with regard to both the severance and stock plans rests on whether he can show that he was entitled to the benefits under either ERISA protected plan and that he was terminated by QuikTrip to avoid payment of these benefits. See Montgomery v. John Deere Co., 169 F.3d 556, 561 (8th Cir. 1999). To determine if Pendleton was actually entitled to benefits under either plan, we first examine the ERISA plan documents. Jenson v. Sipco, Inc., 38 F.3d 945, 949 (8th Cir. 1994). If any part of the plan document is ambiguous, the court looks at the entire document and even extrinsic evidence to determine its intent and purpose. Id. at 950. Whether an employee is entitled to benefits under ERISA is controlled by the plan documents and not the customs of a company. See Cole v. Intern. Union, United Auto., Aerospace & Agr. Implement Workers, 533 F.3d 932, 937 (8th Cir. 2008) (discussing the formal elements of an ERISA plan document).

Pendleton first argues that QuikTrip terminated him to avoid paying severance benefits. Pendleton contends that the severance plan is ambiguous because the plan's language is both prescriptive, in stating that severance packages for directors "will be

-6-

negotiated," and discretionary, in stating that "severance based on tenure with QuikTrip may under certain circumstances also be provided." Pendleton urges the court to explore extrinsic evidence, such as QuikTrip's payment of severance to other directors and the email statements of company management, to prove that he was actually entitled to benefits under the plan. Jenson, 38 F.3d at 945 (courts should examine an ambiguous benefit plan "in light of all the circumstances").

The district court properly held that Pendleton did not make a prima facie case because he was not entitled to any benefits under the plain language of the severance plan. The severance plan clearly states that "employees terminated for cause will not receive severance." Pendleton was terminated for cause, and he was therefore fully excluded from severance benefits. Furthermore, even if Pendleton had separated from QuikTrip without cause, he still would not have been entitled to benefits. He did not meet any of the criteria in the plan to qualify for severance. His position was not eliminated, he was not disabled, he did not meet the tenure rule of 75, and he did not die. QuikTrip's severance plan requires directors to fall within one of the listed categories to even qualify for negotiations for severance benefits. Thus, whether the benefits "will" or "may" be negotiated does not negate Pendleton's need to meet the eligibility requirements stated in the plain language of the plan.

The extrinsic evidence raised by Pendleton to show confusion and disparate treatment by QuikTrip in its severance policy cannot create ambiguity in a plan that clearly does not entitle him to benefits. See Palmisano v. Allina Health Systems, Inc., 190 F.3d 881, 888 (8th Cir. 1999). The fact that several other directors received severance benefits does not have any direct bearing on Pendleton's entitlement to those benefits. See Jefferson v. Vickers Inc., 102 F.3d 960, (8th Cir. 1996) (providing that a company's gratuitous severance payment to some employees does not entitle other employees to the same treatment). Additionally, non plan documents, such as the email from the director of human resources that signified "no change" for directors in the revised plan, cannot create ambiguity in the actual

severance plan.  See Palmisano, 190 F.3d at 888.  Pendleton's proffered extrinsic evidence does not raise genuine issues of material fact as to his entitlement to benefits when he does not qualify for benefits under the clear and unambiguous language of the plan.

In addition to claiming an entitlement to severance benefits, Pendleton contends that the district court erred in denying him benefits under the stock plan. Pendleton argues that the plan is ambiguous and that other directors were able to slow the speed at which QuikTrip repurchased their stock, even though they did not meet the requirements of the stock plan.  He claims that these other directors were given special privileges by the QuikTrip board.  Pendleton submits that  he was entitled to benefits under the stock plan because the board would likely have given him the same benefit as the other directors.

QuikTrip's stock plan unambiguously states that  QuikTrip may repurchase the stock of terminated employees within 180 days.  While there are exceptions to this policy, they do not apply to Pendleton.  One exception provides that employees who are terminated after 20 years or more of employment with the company may slow the rate at which QuikTrip can repurchase their stock.  Since Pendleton only worked for QuikTrip for 15 years, he does not fall into that category.  The stock plan also slows the rate of repurchase for employees who "retire" meaning they meet the rule of 75, become permanently disabled, or are specially designated by the board.  Pendleton presents no evidence that he met the rule of 75, was permanently disabled, or was specially designated by the board.  Pendleton considers himself entitled to stock benefits because the board could have made a special case for him since they did it for other directors.  By contending that he could have been deemed a special case, Pendleton all but admits that his only hope for stock benefits would have been special action by the board.

Pendleton's ability to prove a prima facie case is undermined by the lack of evidence that he was entitled to benefits under either the severance or stock plans. Moreover, Pendleton has also not shown that the stated reasons for his termination were pretextual. Fitzgerald, 521 F.3d at 871. After Pendleton announced his intent to leave QuikTrip, Marchesano asked him to remain with the company to help with the transition. Pendleton offered no evidence to show that QuikTrip abruptly forced him out as a means to avoid giving him benefits. No evidence suggests that QuikTrip's management even considered the financial impact to the corporation of terminating Pendleton. Indeed, Pendleton admitted that he did not have knowledge that Marchesano and Thoene were acting in bad faith.

QuikTrip offered Pendleton eight weeks of severance pay before litigation began, which he declined. His termination gave QuikTrip the unequivocal right to repurchase Pendleton's stock under the plan. QuikTrip states that it will pay Pendleton $677,956.53 in exchange for his shares and Pendleton does not contest that amount. Finally, QuikTrip did not withhold any payment of salary, bonuses, or other benefits upon Pendleton's departure. QuikTrip gave Pendleton all the benefits that he was entitled to under the terms of the severance and stock plans. We conclude that QuikTrip was entitled to summary judgment on Pendleton's § 510 claim.

At the conclusion of the trial, QuikTrip moved for attorney fees in the amount of $50,000. The district court denied the motion. We review de novo legal issues related to an award of attorney fees, Advantage Media, L.L.C. v. City of Hopkins, Minn., 511 F.3d 833, 836 (8th Cir. 2008), and an actual award of attorney fees for abuse of discretion. Roemmich v. Eagle Eye Dev., LLC., 526 F.3d 343, 354 (8th Cir. 2008).

Under § 502(g) of ERISA, a court may in its discretion award reasonable attorney fees and costs to the prevailing party. 29 U.S.C. § 1132(g) (2006). In determining whether or not to award fees, we have outlined several factors for district courts to consider, but these factors need not be applied mechanically. Martin v. Ark. Blue Cross & Blue Shield, 299 F.3d 966, 969 (8th Cir. 2002). The court should look at the degree of parties' culpability, the ability to satisfy an award of attorney fees, whether an award of fees could deter other persons, whether the case involves a significant question regarding ERISA, and the relative merits of the parties' case. Lawrence v. Westerhaus, 749 F.2d 494, 496 (8th Cir. 1984).

The district court's decision to deny attorney fees in this case was entered on the docket as "ordered denied without authority." This statement could be interpreted as a determination that QuikTrip had not made a sufficient showing of factors in its favor to authorize an award of fees, but it is not free of ambiguity. Trial courts have many demands on their time, but nonetheless a district court should state the factors it is relying on in deciding an ERISA fee motion. See e.g. Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan, 2009 WL 692398, *2 (3d Cir. 2009); Riley v. Adm'r of Supersaver 401K Capital Accumulation Plan for Employees of Participating AMR Corp. Subsidiaries, 209 F.3d 780, 782 (5th Cir. 2000).

Although the district court did not discuss the factors in this case, its ruling is supported by the record made by the parties. The record does not reflect that Pendleton brought this action in bad faith. He responded to QuikTrip's summary judgment motion and vigorously defended his claims throughout. The evidence suggests that Pendleton believed that he had a valid claim under § 510 of ERISA. See Maune v. Int'l Broth. of Elec. Workers, Local No. 1, Health & Welfare Fund, 83 F. 3d. 959, 964 (8th Cir. 1996) (holding that when a plaintiff brings a claim in good faith it can be sufficient to deny an award of attorney fees to the other party). Finally, the amount of fees sought would be equivalent to a not insignificant amount of the benefits he was owed.

Accordingly, we affirm the judgment of the district court.

_____