# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 09-1997, 2075

_____

| | | |
|---|---|---|
| In re: Fitzgerald Marine & Repair, Inc., for exoneration from or limitation of liability, | * * * * | |
| Petitioner - Appellant, | * * * * | |
| _____ | * | |
| Mike Jenkins, | * * | |
| Plaintiff, | * * | Appeal from the United States District Court for the Eastern |
| v. | * * | District of Missouri. |
| Fitzgerald Marine & Repair, Inc., | * * | |
| Defendant - Appellant, | * * | |
| v. | * * | |
| Ingram Barge Company, | * * | |
| Defendant - Appellee. | * | |

_____

Submitted: January 13, 2010
Filed: August 11, 2010

_____

Before GRUENDER and SHEPHERD, Circuit Judges, and JARVEY,[1] District Judge.

_____

SHEPHERD, Circuit Judge.

This case arises out of the sinking of the M/V Charles B. Holman ("Holman"), a tugboat operated by the appellee, Ingram Barge Company ("Ingram"). Ingram and the appellant, Fitzgerald Marine & Repair, Inc. ("Fitzgerald"), have a longstanding contractual relationship, pursuant to which Fitzgerald performs repair and maintenance of Ingram boats and barges. Fitzgerald employee, Mike Jenkins, was a crewmember aboard Fitzgerald's vessel, the M/V K.W. ("K.W."), that responded to the Holman's distress call. While aiding the Holman, Jenkins was injured, and he subsequently brought suit against both Fitzgerald and Ingram.

Ingram filed a cross-claim against Fitzgerald for contractual indemnity. Fitzgerald filed a cross-claim against Ingram, asserting common law contribution and indemnity. Ingram and Fitzgerald filed cross-motions for summary judgment. The district court[2] granted summary judgment for Ingram and denied Fitzgerald's motion, holding that Fitzgerald was contractually obligated to indemnify Ingram. Jenkins's claims against both Fitzgerald and Ingram were settled. Ingram sought, and was awarded, attorney's fees and costs of $217,162.61, the entire amount of its fees and expenses related to all parts of this litigation. Fitzgerald appeals the grant of summary judgment to Ingram on its cross-claim for contractual indemnity, the denial of summary judgment to Fitzgerald on its common law indemnity and contribution claims, and the award of attorney's fees and costs to Ingram. We affirm.

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

I.

Fitzgerald's business is repairing barges and boats. Its office is in Charleston, Missouri. Fitzgerald works almost exclusively for Ingram. Ingram operates boats and barges on inland rivers, including on the Mississippi River near Columbus, Kentucky (the "Columbus fleets"). Ingram tugboats, including the Holman, watch over the Columbus fleets and move barges in and out of them. Fitzgerald works almost exclusively on Ingram's Columbus fleets, mainly Ingram's barges. Fitzgerald repair crews work twelve-hour shifts, from 6 a.m. to 6 p.m. At the beginning of each Fitzgerald shift, Ingram dispatches Fitzgerald crews to various repair projects.

The contractual agreement in effect between the parties on July 2, 2006, the date the Holman sank, was the Service Agreement entered into on June 12, 2001 (the "2001 Service Agreement"). The 2001 Service Agreement was set to expire, by its own terms, on June 12, 2006, with an option to renew for another five years. The 2001 Service Agreement was extended, by oral agreement, and was in effect on July 2, 2006.[3] Pursuant to the 2001 Service Agreement,

_____

[3]Ingram sought indemnity on the basis of two contractual agreements with Fitzgerald: (1) the 2001 Service Agreement, which it asserted was extended by oral agreement of Rick Harnack of Ingram and Riley Fitzgerald, and (2) the Service Agreement executed on March 1, 2003 (the "2003 Service Agreement") and set to expire on February 29, 2008. In its brief, Fitzgerald argued that only the 2001 Service Agreement governed the services provided by the K.W. and that, when it expired on June 12, 2006, there was no agreement between the parties as to the services provided by the K.W. (See Appellant's Br. 17.) However, at oral argument, Fitzgerald conceded that the 2001 Service Agreement (which it had admitted applied to the K.W. in its brief) was extended by oral agreement and was in effect at the time of the Holman incident. Ingram has not abandoned its argument that the 2003 Service Agreement was in place and applied to the Holman incident, and we see no support for Fitzgerald's argument that the agreement covered only specific vessels in the terms of the agreement. Rather, the 2003 Service Agreement specifies the services covered, including "[r]epair of barges, towboats, and other vessels." (Appellant's Add. 7.) Craig Poore, Sr., the K.W.'s supervisor/operator, testified that his crew was a repair

-3-

[Fitzgerald] shall provide [Ingram] the following services upon request:

(a)    Repair of barges, towboats, and other vessels and any appurtenances, tackle, gear, or appliances of such vessels; and

(b)    Such other services as may be agreed upon by the parties.

All of such services shall be performed at the [Ingram] facility in the vicinity of Columbus, Kentucky, including barge fleets operated in conjunction with the [Ingram] operation on both sides of the river. [Ingram] shall give [Fitzgerald] at least 24 hours' advance notice of its service requirements.

(Appellant's Add. 1.)  The agreement contained an indemnity provision.

The K.W. crew utilized the K.W., a small boat, and its welding flat, a small barge, primarily to perform welding repairs on barges in Ingram's Columbus fleets. On July 2, 2006, the K.W. had a three-man crew, consisting of Craig Poore, Sr., operator/supervisor; Craig Poore, Jr., laborer; and Jenkins, welder. The K.W.'s crew spent the day performing repairs on two Ingram barges. At about 4:30 p.m,[4] the

---

crew. (See Appellant's App. 670.)  Therefore, it appears that the repair services provided by the K.W. were covered by the 2003 Service Agreement, which by its terms, was in effect at the time of the Holman incident.  However, there are no material differences between the agreements as relevant here.  Thus, because both parties agree that the 2001 Service Agreement was in effect at the time of the Holman incident and applied to the K.W., we apply its terms to this appeal.

[4]This time is within the period that Fitzgerald repair crews are authorized to return to the dock, even though Ingram is billed for a 12-hour day.  Poore, Sr., explained, "I'm allowed enough time to . . . go back to the dock to restock the boat, finish filling out paperwork, fax that paperwork, and then go back across to Missouri before six o'clock."  (Appellant's App. 668.)

K.W.'s crew had finished their repair work for the day and were heading back to the dock when a distress call was issued by the Holman.[5]

The K.W. came to the aid of the Holman, arriving at the Holman at about 4:45 p.m.[6] The Holman was taking on water and was in danger of sinking. Poore, Sr., described the situation as follows: "The [Holman] was listed to the starboard side. Half of the stern was underwater. The deckhands and the pilot was [sic] standing on [an adjacent] barge." (Appellant's App. 670.) Jenkins described the situation as an "emergency" and stated that "none of [the K.W.'s crewmembers] had ever handled a situation like [it] before." (Id. at 676.) Jenkins testified that it was an emergency because "the whole stern of the [Holman] was underwater and there was approximately five and a half to six feet of water in the engine room, and it was pretty inevitable that the boat was going to turn." (Id.) Jenkins stated that he had witnessed a tugboat sinking "probably three" times "over the years" and that it is an "unusual" occurrence. (Id.)

Ingram did not provide the K.W. crew with any specific instructions. Poore, Sr., testified to the following:

Q.    But you are a repair crew, right?

A.    Yes, sir, I am.

_____

[5]The district court noted, "It is unclear whether the K.W. crew was answering a general distress call or was answering a specific directive from Ingram to go to work on the Holman." Jenkins v. Fitzgerald Marine & Repair, No. 1:07CV123 CDP, 2008 WL 4790343, at *2 (E.D. Mo. Oct. 27, 2008) (unpublished).

[6]At least one other boat attempted to rescue the Holman. Additional boats were nearby but refused to aid in the rescue effort because, according to Fitzgerald, the crew members of the other boats felt the job was too dangerous.

-5-

Q. And that's why you were sent over there?

A. No. I was sent over there to set up pumps.

(Id. at 670.) Poore, Sr., later stated, "The only thing I was asked by Tommy McBride, the captain [of the Holman], [was] 'Craig, can you save it?'" And Poore, Sr., replied, "I don't know. I'll try." (Id. at 671.)

The K.W. crew boarded the Holman, taking along with it one of the K.W.'s pumps for the purpose of removing water from the Holman. The K.W. crew was able to start the pump. Poore, Sr., remained on the Holman, and Poore, Jr., and Jenkins went back to the K.W. to get more pumps. According to Jenkins, he injured his back throwing a pump from the K.W. to the Holman. Before the K.W. crew was able to start the second pump, Poore, Sr., ordered his crew off the Holman because he determined that the Holman was going to sink. Poore, Sr., explained, "I looked in the engine room and there was about 6 foot of water, and the door from the galley area, whatever it was, water was just pouring in. It scared me. It was time to get off. I was ready to get off that boat." (Id. at 673.) According to Jenkins, he aggravated his injury by cutting a wire securing the Holman to a loaded tank barge, after it became apparent that the Holman could not be saved. The Holman sank within about 25 minutes of the K.W.'s arrival on the scene. Ingram determined the Holman sank because an Ingram employee had not closed a manhole cover on the Holman's starboard stern buoyancy compartment, causing the boat to swamp itself.

Fitzgerald billed Ingram for a 12-hour shift for the K.W. on July 2, 2006. There is no record reflecting that Fitzgerald specifically billed Ingram for its time spent aiding the Holman. The incident occurred during the time period that is allotted to Fitzgerald vessels to return to the dock and still bill Ingram for a complete 12 hours of work.

Jenkins sued both Fitzgerald and Ingram for the injuries he sustained in the Holman incident, alleging five counts. In Count I, Jenkins alleged that Fitzgerald had violated the Jones Act, 46 U.S.C. § 688 et seq.[7] Counts II and IV alleged claims against both Fitzgerald and Ingram for unseaworthiness.[8] In Count III, Jenkins alleged a claim for maintenance and cure against Fitzgerald.[9] Count V alleged a common law negligence claim against Ingram.

Ingram filed a cross-claim against Fitzgerald, alleging that Fitzgerald was contractually obligated to indemnify Ingram for Jenkins's claims. Fitzgerald filed a cross-claim against Ingram, alleging that, in the event Jenkins obtained a judgment against Fitzgerald, Fitzgerald was entitled to contribution and indemnification from Ingram under common law. Both parties sought summary judgment on their cross-claims.

On October 27, 2008, the district court granted summary judgment to Ingram on both its cross-claim and Fitzgerald's cross-claim, concluding that "under the contract between the two companies, Fitzgerald agreed to indemnify Ingram for injuries to its employees such as that alleged by Jenkins here," Jenkins v. Fitzgerald Marine & Repair, No. 1:07CV123 CDP, 2008 WL 4790343, at *1 (E.D. Mo. Oct. 27, 2008) (unpublished). Following the district court's summary judgment ruling, the

---

[7]"A Jones Act claim is an *in personam* action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members." Britton v. U.S.S. Great Lakes Fleet, Inc., 302 F.3d 812, 816-17 (8th Cir. 2002) (quoting Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441 (2001)).

[8]"Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." Britton, 302 F.3d at 818 (quoting Lewis, 531 U.S. at 441).

[9]"'Maintenance and cure' is a contractual form of compensation given by general maritime law to a seaman who falls ill while in the service of his vessel," which "is not based upon negligence nor is it limited to those situations where the seaman's employment is the direct cause of the illness or injury." Britton, 302 F.3d at 815 (quotations and citations omitted).

parties settled Jenkins's claims which were then dismissed by stipulation on February 3, 2009.

Ingram then filed a request for attorney's fees, the only expense it incurred in defending Jenkins's claims, and prejudgment interest. Ingram sought a judgment in the amount of $217,162.61, consisting of attorney's fees and expenses of $212,613.61 and prejudgment interest of $4,549. This request covered all fees and expenses that Ingram had incurred in all parts of the litigation. Ingram segregated the amount of attorney's fees and expenses, representing that it expended $142,219.69 in defending against Jenkins's claims and $70,393.92[10] in defending against Fitzgerald's cross-claim *and* prosecuting its own cross-claim for contractual indemnity. The court determined that the first category of attorney's fees and expenses were recoverable as "expenses" covered by the indemnification clause of the parties' contractual agreement. The court further concluded that Ingram was entitled to recover all of the fees and expenses in the second category because the time and effort spent defending against Fitzgerald's cross-claim (recoverable for the same reason as the first category of fees and expenses) could not reasonably be segregated from that spent to prove Ingram's own cross-claim. The court also found that the amount of fees claimed by Ingram was reasonable. Fitzgerald appeals.

II.

Fitzgerald appeals the district court's grant of summary judgment on Ingram's cross-claim for contractual indemnity, as well as the court's denial of summary

---

[10]The district court noted, "In its reply brief, Ingram agrees that it incorrectly allocated some fees to the Jenkins defense which should not have been allocated to the Fitzgerald dispute, and [the court] [was] using those numbers . . . , but given [the court's] conclusion that all fees should be recovered, which group these particular fees belong in is immaterial, and the total award does not change." Jenkins v. Fitzgerald Marine & Repair, Nos. 1:07CV27 CDP, 1:07CV123 CDP, 1:08CV36 CDP, 2008 WL 4790343, at *1 n.1 (E.D. Mo. Apr. 29, 2009) (unpublished).

judgment to Fitzgerald's on its claim for common law indemnity and contribution. Fitzgerald also appeals the court's award to Ingram of attorney's fees and costs. We address each issue in turn.

A.

First, Fitzgerald argues the district court erred in determining that, as a matter of law, Fitzgerald was contractually obligated to indemnify Ingram for Jenkins's claims.

> We review the grant of summary judgment de novo. Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. This court views the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.

Lackawanna Chapter of Ry. & Locomotive Historical Soc'y, Inc. v. St. Louis County, Mo., 606 F.3d 886, 888 (8th Cir. 2010) (per curiam) (citations omitted).

Contract interpretation, including construction of indemnity clauses and whether a contract is ambiguous, is a matter of law which we review de novo. See Med. Protective Co. v. Bubenik, 594 F.3d 1047, 1051 (8th Cir. 2010); Gander Mountain Co. v. Cabela's, Inc., 540 F.3d 827, 831 (8th Cir. 2008). Generally, disputes with regard to contract interpretation are governed by state law. See Myers v. Richland County, 429 F.3d 740, 749-50 (8th Cir. 2005); Larken, Inc. v. Wray, 189 F.3d 729, 732-33 (8th Cir. 1999). However, because the 2001 Service Agreement is a contract for, among other things, repairs to marine vessels, it is a maritime contract. See New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 99 (1922); Sw. Marine, Inc. v. Danzig, 217 F.3d 1128, 1135 (9th Cir. 2000). Thus, our interpretation of the 2001 Service Agreement, including the indemnity clause, is a matter governed by maritime law, "a body of federal jurisprudence, [that is] largely uncodified." Sander v. Alexander Richardson Invs., 334 F.3d 712, 715 (8th Cir. 2003) ("Because the subject

-9-

matter of the contract at issue–the slip rental agreement–is maritime, we apply admiralty law."); see also 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 5-20 (4th ed. 2004) ("The interpretation of an admiralty indemnity contract is governed by federal maritime law.").

At the outset, we consider Fitzgerald's claim that we should consider extrinsic evidence in ascertaining the meaning of the 2001 Service Agreement because it is ambiguous. Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1214 (5th Cir. 1986) (holding that, under federal maritime law, "a court should *not* look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous" (emphasis added)); see Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 332-33 (5th Cir. 1981) ("Although Shell insists that under Louisiana law the intent of contracting parties may always be shown by extrinsic evidence, federal maritime law is different: a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous."). Fitzgerald premises its ambiguity argument on two bases: (1) the district court's conclusion that the 2001 Service Agreement required Fitzgerald to respond to emergencies is inconsistent with the agreement's 24-hour notice provision, and (2) the indemnity provision contains a latent ambiguity because, when the contract is read in reference to a particular claim, it is unclear whether it applies.

First, although the first ground is disguised as an "ambiguity" argument, Fitzgerald is, in actuality, attacking the district court's conclusion that Jenkins's claims fell within the indemnity provision, i.e., that emergency rescue was included in the services Fitzgerald agreed to provide to Ingram. Thus, Fitzgerald's argument actually goes to the ultimate issue in this case, whether Jenkins's claims fall within the scope of the indemnity provision of the 2001 Service Agreement. We, therefore, decline to find the contract ambiguous for the reason offered by Fitzgerald.

Second, in support of its latent ambiguity contention, Fitzgerald cites a nonmaritime case, Global Network Technologies, Inc. v. Reg'l Airport Auth., 122

F.3d 661 (8th Cir. 1997), for the proposition that a latent ambiguity occurs "where a writing on its face appears clear and unambiguous, but some collateral matter makes the meaning uncertain." Id. at 665; see, e.g., Stark v. Sandberg, Phoenix & von Gontard, P.C., 381 F.3d 793, 801-02 (8th Cir. 2004) (holding that a latent ambiguity existed in exclusionary language in an arbitration clause "[w]hen viewed in the context of Missouri law governing exculpatory clauses" because "the clause attempt[ed] to effect a prospective waiver of rights which Missouri law holds may not be waived"). Here, Fitzgerald is essentially arguing that the indemnity provision is so broadly worded that a court cannot discern when it applies, rendering it ambiguous. However, the sweeping nature of the indemnity clause, in and of itself, does not establish ambiguity. Under federal maritime law,

> Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties. Where the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and this Court will construe the contract as a matter of law.

Breaux v. Halliburton Energy Servs., 562 F.3d 358, 364 (5th Cir. 2009) (quotations and citations omitted). We conclude that, although broad in scope, the language of the indemnity provision can be interpreted and applied to a given set of facts, here the Holman incident, in order to determine whether, as a matter of law, the event triggered Fitzgerald's indemnity obligation. Accordingly, the indemnity provision is not ambiguous.[11]

---

[11]Based on our conclusion, we reject Fitzgerald's argument that the indemnity provision should be construed against the drafter, as we only employ this principle upon a finding of ambiguity. See Thomas J. Schoenbaum, Admiralty & Mar. Law § 5-20 (4th ed. 2004) (providing that ambiguities in the indemnity clause of an admiralty contract "will be construed strongly against the drafter").

Whether the 2001 Service Agreement requires Fitzgerald to indemnify Ingram for Jenkins's claims is controlled by the language of the indemnity provision, which provides:

> Indemnity. [Fitzgerald] shall indemnify, hold harmless, and defend [Ingram] and its affiliated companies . . . and its and their employees, agents, and vessels, from and against (a) any and all claims, liabilities, penalties, and expenses based upon or arising in connection with injury to or death of the employees or agents of [Fitzgerald] . . . , regardless of any negligence on the part of the party to be indemnified or the unseaworthiness of any vessel owned, chartered, operated, or controlled by such party, and (b) any other claims, liabilities, penalties, and expenses arising in connection with [Fitzgerald]'s operations unless caused by the sole negligence of [Ingram] or its affiliates, or its or their employees, agents, or other contractors or subcontractors.

(Appellant's Add. 3.)

Pursuant to federal maritime law, we are to construe the indemnity provision broadly. See Fontenot, 791 F.2d at 1214. The provision contains two clauses. Clause (a) relates to the injuries to Fitzgerald employees, and clause (b) applies to third parties. Because Jenkins was undisputedly a Fitzgerald employee at the time of the Holman incident, clause (a) is, at least, potentially applicable to Jenkins's claims arising out of that event. We do not construe clause (a) in isolation, but rather in the context of the 2001 Service Agreement as a whole. See Breaux, 562 F.3d at 364 ("A maritime contract containing an indemnity agreement . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous." (alteration in original) (quoting Weathersby v. Conoco Oil Co., 752 F.2d 953, 955 (5th Cir. 1984)). Viewing clause (a) through this lens, we conclude that it requires Fitzgerald to indemnify Ingram for *all* injuries to Fitzgerald employees that arise *in connection with* the 2001 Service Agreement.[12]

_____

[12]The district court construed the indemnity provision to extend to all injuries of Fitzgerald employees, even if they did not arise in connection to the 2001 Service

-12-

As we have already noted, it is undisputed that Jenkins was a Fitzgerald employee on the day of the Holman incident. Next, we must consider whether Jenkins's injuries arose in connection with the 2001 Service Agreement. In resolving this question, the parties rely heavily on the Fifth Circuit's decision in Corbitt. Corbitt provides:

> A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

Id. at 333. The parties debate Corbitt's meaning, with Fitzgerald arguing that it imposes a two-prong test for indemnity and Ingram arguing that it provides two alternative bases for indemnity. Corbitt's use of the terms "neither . . . nor" confirms that it was meant to read in the disjunctive, and not the conjunctive, such that Ingram's interpretation prevails.

---

Agreement, because the clause contains no language so limiting it. However, we conclude that this interpretation of the indemnity clause is contrary to two rules of construction for federal maritime contracts, that an indemnity provision (1) be read in the context of the contract as a whole, see Breaux, 562 F.3d at 364; Weathersby v. Conoco Oil Co., 752 F.2d 953, 955 (5th Cir. 1984), and (2) not be interpreted in a manner that leads to absurd results, see Chembulk Trading LLC v. Chemex Ltd., 393 F.3d 550, 555 n.6 (5th Cir. 2004) ("A contract is not ambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation."). Because the district court's interpretation of the 2001 Service Agreement's indemnity clause could yield an absurd result—for example, shifting liability to Fitzgerald for injuries sustained by an off duty Fitzgerald employee who is fishing from his own vessel and hit by an Ingram vessel—we reject it and construe the indemnity clause to cover only claims of Fitzgerald employees that arise in connection to the contract.

-13-

Another instructive case is <u>Fontenot</u>. <u>Fontenot</u> is a maritime case involving a semi-submersible drilling rig, the Rowan-Midland, owned by Rowandrill, Inc., and chartered by Mesa Petroleum Company ("Mesa"). 791 F.2d at 1210. The Rowandrill-Mesa contract contained an indemnity provision, providing:

> [Mesa] agrees to protect, defend, indemnify and save [Rowandrill] from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party, arising in connection herewith in favor of [Mesa]'s employees, [Mesa]'s contractors or their employees other than [Rowandrill's employees or its subcontractors or their employees] on account of bodily injury, death or damage to property.

<u>Id.</u> at 1213 (alterations in original). In addition, "Rowandrill agreed to indemnify Mesa for injuries sustained by Rowandrill personnel, contractors, and property." <u>Id.</u> at 1213 n.3.

Bristow Offshore Helicopters, Inc. ("Bristow") provided helicopter transportation services to Mesa. <u>Id.</u> at 1210. Andrew Fontenot, an employee of an engineering company, was onboard a Bristow helicopter en route to his company's rig that was under contract to Mesa. <u>Id.</u> Fontenot suffered injuries in a fall on the slippery heliport surface of the Rowan-Midland, when a Bristow helicopter stopped to refuel. <u>Id.</u> Fontenot brought claims against Rowandrill and Mesa, which were settled, and Rowandrill and Mesa's cross-claims for indemnity remained before the district court. <u>Id.</u> The district court determined that Rowandrill was not entitled to contractual indemnity from Mesa, holding "that Fontenot's claim was not one 'arising in connection herewith' because the use of the heliport was only incidental to the business of drilling a well or wells, the stated purpose of the contract." <u>Id.</u> at 1213.

The Fifth Circuit reversed, determining that Mesa owed Rowandrill a duty of indemnification for its share of Fontenot's settlement. <u>Id.</u> at 1213-16. In so holding, the court observed that the phrase "arising in connecting herewith" is to be "broadly construed . . . to unambiguously encompass all activities reasonably incident or

-14-

anticipated by the principal activity of the contract." Id. at 1214; see Schoenbaum, supra, § 5-20 (providing that an indemnity provision in a maritime contract stating "that indemnity extends to all activities 'arising out of' or 'in connection with' the work under the contract will [be] give[n] broad effect"). The court further explained:

> [W]here the presence of the injured person at the scene of the injury is attributable to or might reasonably be anticipated by his employment responsibilities, then his injuries occur "in connection with" those responsibilities. It is irrelevant that the person is not at that moment performing services or that the injury results from an activity not encompassed by the employer's contractual undertakings.

Fontenot, 791 F.2d at 1215. Applying Corbitt and Fontenot here, we hold that Jenkins's act of throwing a pump to the sinking Holman was covered by clause (a) because, even if it was not expressly within clause (a)'s terms, the activity is of such a character that it can be reasonably inferred that the parties intended to include it within the indemnity coverage. See Fontenot, 791 F.2d at 1215; Corbitt, 654 F.2d at 333.

Fitzgerald argues that our interpretation of the indemnity provision violates the "absurdity doctrine" articulated by the Missouri Court of Appeals in Tumlinson v. Norfolk & W. Ry. Co., 775 S.W.2d 251 (Mo. Ct. App. 1989). There, the court determined that the agreement at issue was "ambiguous because the words taken literally le[d] to absurd results." Id. at 253. Similarly, maritime law provides that construction of a maritime contract should not "lead[] to . . . absurd consequences." Chembulk Trading LLC v. Chemex Ltd., 393 F.3d 550, 555 n.6 (5th Cir. 2004). Fitzgerald asserts that enforcement of the indemnity provision, according to its literal terms, would produce an absurd result—shifting liability to Fitzgerald for accidents having nothing to do with the subject of the 2001 Service Agreement and for situations over which Fitzgerald had no control. However, our conclusion that clause (a) of the indemnity provision of the 2001 Service Agreement covers Jenkins's claims arising out of the Holman incident is *not* an absurd result. Pursuant to Fitzgerald and

-15-

Ingram's contractual relationship, Fitzgerald repaired Ingram's vessels and agreed to indemnify Ingram for all injuries incurred by Fitzgerald employees pursuant to their work for Ingram. That Fitzgerald is now bound to indemnify Ingram for a Fitzgerald employee's claims arising out of his aid to an Ingram tugboat in distress is reasonable.

Fitzgerald next argues that Jenkins's injuries could not have occurred in connection with the 2001 Service Agreement because the contract contains a 24-hour notice provision. The contract states that Ingram "shall give [Fitzgerald] at least 24 hours' advance notice of its service requirements." (Appellant's Add. 1.) It is undisputed that, despite this stated requirement, the K.W. and its crew responded to the Holman's distress call. Furthermore, under federal maritime law, whether Jenkins's presence at the Holman incident was "encompassed by [Fitzgerald's] contractual undertakings" is not "relevant" because his "presence . . . [was] attributable to or might reasonably be anticipated by his employment responsibilities . . . ." Fontenot, 791 F.2d at 1215. Therefore, any noncompliance with the 2001 Service Agreement's notice provision does not alter our conclusion that Jenkins's claims are covered by the contract's indemnity provision.

Finally, Fitzgerald argues that it should not be required to indemnify Ingram for Jenkins's injuries because the K.W. and its crew were acting as "Good Samaritans." "Technically, a 'Good Samaritan' is 'one who compassionately renders personal assistance to the unfortunate . . . .'" Bart Lounsbury, Digging Out of the Holes We've Made: Hardrock Mining, Good Samaritans, and the Need for Comprehensive Action, 32 Harv. Envtl. L. Rev. 149, 171 (2008) (citing Webster's Third New International Dictionary 979 (2002)); see Luke 10:25-37. In light of the longstanding contractual relationship of the parties, Fitzgerald is not simply a Good Samaritan. Furthermore, we have already determined that Jenkins's claims arose in connection to the 2001 Service Agreement. Therefore, there is no basis for exempting Fitzgerald from its indemnity obligation as a Good Samaritan. See Pac. Indem. Co. v. Whaley, 560 F. Supp. 2d 425, 429-30 (D. Md. 2008) (denying dismissal of roofing contractor's indemnity and contribution claims against roofing subcontractor on the basis that the

subcontractor acted as a "Good Samaritan" in tarping the roof because a genuine issue of material fact existed as to whether the roofing subcontractor had a contractual duty to tarp roof); cf. Urban v. Acadian Contractors, Inc., 627 F. Supp. 2d 699, 709-12 (W.D. La. 2007) (holding that indemnitor, which agreed to defend oil company and its contractors for "any and all" liability or damages whether "directly or indirectly arising out of" or "in connection with" personal or bodily injury, owed a duty to defend the claims against the contractor for injury sustained by indemnitor's employee while acting as a Good Samaritan in seeking to extinguish a fire caused by alleged gross negligent of contractor).

In sum, we hold that Fitzgerald is contractually bound to indemnify Ingram for Jenkins's claims arising out of the Holman incident. Therefore, we affirm the district court's grant of summary judgment to Ingram on its cross-claim for contractual indemnity.

B.

Next, we review de novo Fitzgerald's appeal of the district court's grant of summary judgment to Ingram on Fitzgerald's cross-claim for contribution and indemnity under common law. See Lackawanna, 606 F.3d at 888 (standard of review).

In its opening brief, Fitzgerald relies on the same arguments we rejected in Part A as also demonstrating that the district court erred in granting summary judgment to Ingram on Fitzgerald's cross-claim for contribution and indemnity.[13] We first note that admiralty law recognizes the common law doctrines of contribution and indemnity and that Fitzgerald's cross-claim is "determined by federal maritime law, not state law." see Schoenbaum, supra, § 5-18.

---

[13]We note that, in granting summary judgment to Ingram on Fitzgerald's cross-claim, the district court did not separately address the cross-claim.

Contribution is a cause of action that arises when a tortfeasor pays more than his pro rata share of a judgment. Although contribution is an inchoate right when the underlying tort giving rise to common liability occurs, the remedy is not available until the tortfeasor pays more than his share of the judgment. In admiralty the amount of contribution is determined according to principles of comparative fault; one who has paid more than his allocable share of the judgment has an action against any other tortfeasor who has paid less than his share. Contribution, therefore, requires each tortfeasor to pay the proportion of the damages attributable to his actions. Indemnity, in contrast, requires one tortfeasor to reimburse in full another who has discharged a common liability.

Id. (footnote omitted). Because we have determined that Fitzgerald is contractually obligated to indemnify Ingram for Jenkins's claims arising out of the Holman incident, Fitzgerald cannot prevail on its cross-claim for common law contribution and indemnity as it will not: (1) pay Ingram "more than [its] pro rata share" of Jenkins's claims, or (2) be "required to discharge . . . liability [for Jenkins's claims] shared" with Ingram. See id. Therefore, we affirm the district court's grant of summary judgment to Ingram on these claims.

C.

Finally, Fitzgerald seeks reversal of the district court's award of attorney's fees and costs of $217,162.61, consisting of attorney's fees and expenses of $212,613.61 and prejudgment interest of $4,549—the entire amount of Ingram's fees and expenses related to all parts of the litigation arising out of the Holman incident. First, Fitzgerald argues that the award is legal error to the extent that it includes attorney's fees and costs that Ingram incurred prosecuting its cross-claim for indemnity. Second, Fitzgerald contends that, even absent legal error, the total amount of the award is unreasonable. "We review de novo legal issues related to an award of attorney fees, and an actual award of attorney fees for abuse of discretion." Pendleton v. QuikTrip Corp., 567 F.3d 988, 994 (8th Cir. 2009) (citation omitted).

We must first address Ingram's argument that Fitzgerald waived its legal argument by challenging only the reasonableness of the fees before the district court. In the district court, Fitzgerald asserted, "Ingram can not [sic] recover all of the fees it has incurred in this matter. Under well settled precedent, a party that is successful in prosecuting an indemnity claim is entitled to recover only those fees incurred in defending the principal claim, not those incurred in prosecuting the action for indemnity." (Appellant's Appx. 977.) In the district court's ruling on Ingram's request for attorney's fees and costs, the court stated, "Fitzgerald disputes . . . the reasonableness of the fees. It also argues that Ingram cannot recover fees related to the indemnification dispute between it and Fitzgerald." In re Fitzgerald Marine & Repair, Inc., Nos. 1:07CV27 CDP, 1:07CV123 CDP, 1:08CV36 CDP, 2009 WL 1161082, at *1 (E.D. Mo. Apr. 29, 2009) (unpublished). Thus, the record contradicts Ingram's waiver argument. We now address the merits of Fitzgerald's challenge to the attorney's fees award.

"Maritime disputes generally are governed by the 'American Rule,' pursuant to which each party bears its own costs." Tex. A & M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 405 (5th Cir. 2003); see L & L Marine Serv., Inc. v. Ins. Co. of N. Am., 796 F.2d 1032, 1036 n.6 (8th Cir. 1986) ("[T]he American rule appears to have become relatively well embedded in federal maritime law."). "Therefore, absent statute or enforceable contract, litigants must pay their own attorneys' fees." Tex. A & M, 338 F.3d at 405 (quotation omitted). In establishing its entitlement to attorney's fees, Ingram relies on the indemnity provision of the 2001 Service Agreement, providing that:

> [Fitzgerald] shall indemnify, hold harmless, and defend [Ingram] . . . from and against (a) any and all claims, liabilities, penalties, and expenses based upon or arising in connection with injury to or death of the employees or agents of [Fitzgerald] or its vendors or subcontractors, regardless of any negligence on the part of the party to be indemnified or the unseaworthiness of any vessel . . . .

(Appellant's Add. 3.)

"The interpretation of an admiralty indemnity contract is governed by federal maritime law." Schoenbaum, supra, § 5-20. Under maritime law, "[a] contract of indemnity includes the obligation to pay the costs and attorneys fees of the indemnitee against the third party, but not the right to costs and fees in connection with establishing the right to indemnification unless expressly stated." Id. (footnotes omitted); see Becker v. Tidewater, Inc., 586 F.3d 358, 375 (5th Cir. 2009) ("[A] general indemnity provision typically includes recovery of attorneys' fees incurred in defending against a claim covered by the indemnity provision, [but] . . . no right to recover . . . legal fees incurred in establishing [the] right to indemnification. . . . [T]here is some authority for the proposition that attorneys' fees incurred in enforcing a contractual right of indemnity may be recoverable if the indemnity provision specifically anticipates their recoverability[.]" (quotation omitted)); Peter Fabrics, Inc. v. S.S. Hermes, 765 F.2d 306, 316 (2d Cir. 1985) (providing that "when, as here, the obligation to indemnify arises out of a contract, the rule that an indemnitee cannot recover the costs of establishing the right to indemnification does not apply if the agreement explicitly says otherwise" (quotation omitted)); Dillingham Shipyard v. Associated Insulation Co., 649 F.2d 1322, 1328 (9th Cir. 1981) ("The general rule is that attorneys' fees are not awarded in an action to establish a right of indemnity. However, attorneys' fees are recoverable in an action to establish a right of indemnity, where the agreement so provides." (citation omitted)). The indemnity provision at issue here does not expressly provide for the recovery of attorney's fees incurred in establishing indemnity.

Before turning to Fitzgerald's argument that the district court committed legal error by awarding Ingram its attorney's fees and costs incurred in prosecuting its indemnity cross-claim, we note that Fitzgerald does not challenge the legal recoverability of Ingram's attorney's fees and expenses in defending against Jenkins's claims. The breakdown of the district court's award of $217,162.61 of attorney's fees and expenses (and prejudgment interest of $4,549) is as follows: $142.219.69 for Jenkins's claims, and $70,393.92 covering both (1) Fitzgerald's cross-claim for contribution and indemnification and (2) Ingram's prosecution of its own cross-claim

for indemnification (the "nonsegregated category"). As Fitzgerald concedes, and in accordance with maritime authority, see Schoenbaum, supra, § 5-20; Becker, 586 F.3d at 375, it must indemnify Ingram for the $142,219.69 in attorney's fees and costs (assuming the overall award of attorney's fees is reasonable) incurred by Ingram in defending Jenkins's claims because, as we have already determined, Jenkins's claims fall within clause (a) of the 2001 Service Agreement's indemnity provision. Therefore, the Fitzgerald's legal challenge to the attorney's fees award involves only the $70,393.92 in the nonsegregated category.

The nonsegregated category of attorney's fees and expenses is problematic. The first group of attorney's fees in the nonsegregated category— Ingram's fees and costs for defending Fitzgerald's cross-claim for contribution and indemnity—is recoverable for the same reasons as Ingram's attorney's fees and costs for defending Jenkins's claims are recoverable. See Schoenbaum, supra, § 5-20; Becker, 586 F.3d at 375; Peter Fabrics, 765 F.2d at 316; Dillingham Shipyard, 649 F.2d at 1328. However, the second group of fees in the nonsegregated category—Ingram's fees and expenses for its indemnity cross-claim—are not recoverable, because the indemnity provision at issue here does not expressly provide for the recovery of such fees. Cf. Schoenbaum, supra, § 5-20; Peter Fabrics, 765 F.2d at 316; Dillingham Shipyard, 649 F.2d at 1328. Therefore, the nonsegregated category, totaling $70,393.92, covers *both* recoverable and nonrecoverable fees.

The parties have offered no authority addressing such a situation. The federal cases on point apply state law. See Navigant Consulting, Inc. v. Wilkinson, 508 F.3d 277, 297-99 (5th Cir. 2007) (applying Texas law); Fidelity & Deposit Co. of Md. v. Krebs Eng'rs, 859 F.2d 501, 508-09 (7th Cir. 1988) (applying Wisconsin law). In Navigant, Sharon Taulman, a former employee of Navigant, appealed the award of attorney's fees against her. 508 F.3d at 297. At trial, Navigant had prevailed on three claims—breach of fiduciary duty, breach of contract, and misappropriation of trade secrets. Id. at 280. However, Texas law permitted recovery of attorney's fees on only one of the claims, breach of contract. Id. at 298. "Navigant did not segregate its fees

and argued to the district court that segregation was not required [under Texas law] because its recoverable and nonrecoverable claims were inextricably intertwined . . . ." Id. The district court awarded Navigant 60% of the fees it requested, "determin[ing] that some, but not all, of Navigant's claims were intertwined[] [and] that segregation of its fees was not possible." Id.

On appeal, Taulman argued that the district court abused its discretion in awarding Navigant a percentage of the fees it had requested because Navigant had failed to segregate its fees. Id. The Fifth Circuit determined that, under Texas law, "the failure to segregate d[id] not mean that a party cannot recover any of its attorney's fees," and that, "[i]n such instances, unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be." Id. (quotation omitted). The court went on to determine that "[t]he district court, as the trier of fact on the question of attorney's fees, did not abuse its discretion in awarding a percentage of Navigant's fees rather than denying recovery of fees completely." Id. (footnoted omitted).

In Fidelity, the Seventh Circuit remanded an award of attorney's fees to redetermine the amount of the fees because: (1) there was no evidence presented to the district court to support the amount requested, and (2) the district court had not taken into account that a portion of the fees was nonrecoverable. 859 F.2d at 508-09. The court instructed, "In determining the proper amounts to award on remand, the district court should keep in mind that there may be some overlap between recoverable and nonrecoverable [attorney's] fees. This should not prevent the court from reaching a proper allocation. Mathematical precision in awarding damages is not necessary." Id. at 509.

Without any maritime authority mandating that the district court deny Ingram the entire nonsegregated category because it included nonrecoverable attorney's fees, we cannot find an error of law in the district court's award of the entire nonsegregated category to Ingram. Furthermore, this case is distinguishable from Fidelity in that,

here, the district court did not fail to acknowledge the nonrecoverability of a group of the fees and costs in the nonsegregable category—Ingram's attorney's fees and costs incurred in prosecuting its indemnity claim. Rather, the district court awarded Ingram all of the attorney's fees in the nonsegregated category because the court determined that fees in the recoverable group could not "reasonably be segregated" from the fees in the nonrecoverable group. In re Fitzgerald Marine& Repair, Inc., 2009 WL 1161092, at *1. Even if we disagree with this factual finding, it is not clearly erroneous. See United States v. Bailey, 571 F.3d 791, 804 (8th Cir. 2009) ("A district court abuses its discretion when it bases its decision on a legal error or a clearly erroneous finding of fact." (quotation omitted)). Therefore, in light of our standard of review, we affirm the award of attorney's fees and costs in the nonsegregated category. See id. We further reject Fitzgerald's challenge to the reasonableness of the total amount of attorney's fees and costs awarded to Ingram, $217,162.61, finding no abuse of discretion. See Pendleton, 567 F.3d at 994. Therefore, we affirm the district court's award of attorney's fees and costs to Ingram.

## II.

For the reasons stated above, we affirm the district court's: (1) grant of summary judgment to Ingram on its cross-claim for contractual indemnity, (2) grant of summary judgment to Ingram on Fitzgerald's cross-claim for common law contribution and indemnity, and (3) award of attorney's fees and costs to Ingram.

_____