John Denton MYERS, Plaintiff,

v.

HOG SLAT, INC., Defendant.

No. C13–3032–LTS.

United States District Court,
N.D. Iowa,
Central Division.

Signed Oct. 24, 2014.

Katie Anne Ervin Carlson, Thomas W. Foley, Babich Goldman, PC, Des Moines, IA, for Plaintiff.

Angel Anna West, Benjamin Patrick Roach, Randall D. Armentrout, Nyemaster, Goode, West, Hansell & O'Brien, Des Moines, IA, for Defendant.

### ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

LEONARD T. STRAND, United States Magistrate Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1147

II.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1147

III. RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1147

IV.  SUMMARY JUDGMENT STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . 1154

V.   ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1157
     1.  Causal Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1158
     2.  Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1160

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1163

## I. INTRODUCTION

This case is before me on a motion (Doc. No. 19) for partial summary judgment filed by defendant Hog Slat, Inc. (Hog Slat). Plaintiff John Denton Myers (Myers) has filed a resistance (Doc. No. 22) and Hog Slat has filed a reply (Doc. No. 29). I heard oral arguments on September 30, 2014. Thomas W. Foley and Katie Ervin Carlson appeared for Myers. Benjamin P. Roach appeared for Hog Slat. The motion is fully submitted and ready for decision.

## II. PROCEDURAL HISTORY

Myers filed his complaint and jury demand (Doc. No. 2) on June 20, 2013. He contends that he was employed by Hog Slat from 1998 until January 25, 2013, when he was discharged. He further contends that his discharge was motivated by one or both of the following unlawful factors: (a) Hog Slat's desire to avoid exposure to significant health care expenses resulting from his daughter's medical condition and (b) his demand for payment of commissions owed to him. He asserts the following causes of action:

Count I: Associational discrimination in violation of the Americans with Disabilities Act (ADA)

Count II: Interference with employee benefits in violation of the Employee Retirement Income Security Act (ERISA)

Count III: Violation of the Iowa Wage Payment Collection Act

Count IV: Wrongful termination in violation of public policy

Count V: Breach of contract

Doc. No. 2.

Hog Slat filed an answer (Doc. No. 7) in which it denied Myers' operative factual allegations, denied liability as to all claims and asserted various affirmative defenses. This case was referred to me after the parties unanimously consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(3). Doc. No. 12. Trial is scheduled to begin December 8, 2014. Doc. No. 13.

Hog Slat filed its motion for partial summary judgment on August 8, 2014. Hog Slat seeks entry of judgment as a matter of law on all counts except Count IV (wrongful termination in violation of public policy). Myers filed his resistance on September 8, 2014. Myers does not resist entry of summary judgment on Count III (Iowa Wage Payment Collection Act) or Count V (breach of contract). However, Myers contends genuine issues of material fact exist that preclude entry of summary judgment for Hog Slat on Count I(ADA) and Count II (ERISA).

## III. RELEVANT FACTS

The following facts are not in dispute for purposes of Hog Slat's motion for partial summary judgment. Additional facts will be discussed as necessary during the discussion of specific claims.

*Hog Slat.* Hog Slat is a North Carolina company that manufactures and distributes equipment for hog and poultry operations. Its business includes retail distribution and the construction of hog and chicken barns. One service Hog Slat provides is turnkey construction, whereby it contracts to provide all (or nearly all) of the construction services that are necessary to run a hog barn. Hog Slat has approximately 1,000 employees and operates in states with large hog or chicken populations, including Iowa. During all relevant events, Tom Herring was Hog Slat's President, Doug Westfall was its Chief Finan-

cial Officer and Fritz Richards was its National Sales Manager.

*Myers' Employment.* Myers resides in Hardy, Iowa, and was employed as a salesperson for Hog Slat from January 21, 1998, until January 25, 2013. During all relevant times, Myers worked out of Hog Slat's Midwest Regional Office in Humboldt, Iowa. Beginning in approximately 2000 or 2001, he worked primarily as a sales representative for Hog Slat's turnkey hog barns in the Central Iowa territory.

Starting in 2006 or 2007, Myers' direct supervisor was Dale Kenne, the Sales Manager for the Midwest Region. Kenne reported to Richards. As of September or October 2012, Myers was the most productive, in terms of dollars sold, out of the seven salesmen who reported to Kenne. Kenne considered Myers' work performance to be the best of the seven. He never gave Myers a poor performance evaluation and Myers exceeded his expectations as a salesperson.

In March 2010, Myers and Hog Slat entered into a written Sales Compensation Agreement (Agreement) with an effective date of April 1, 2010. The Agreement provided that Myers would be paid a base salary plus a sales commission of "1% on all Turnkey Accounts (Total Contract Amount)." The Agreement included a cap on annual commissions per customer: "Commission is limited to $100,000.00 per Customer per year on Turnkey Accounts." The same cap had been in place under a prior agreement since 2008.

*Prestage.* Prestage is a pork producer that is a significant customer of Hog Slat. The relationship between Hog Slat and Prestage began in North Carolina. Before 2003, Prestage did not build barns in Iowa. When Prestage began remodeling barns in Iowa in 2003, Hog Slat assigned Myers to the account. In 2006, Prestage started building turnkey hog barns in Iowa and used both Hog Slat and another company for those projects.

In late 2007, Richards advised Myers that he was going to become "the Prestage guy" for Hog Slat, meaning he should focus his efforts on Prestage projects. This caused Myers to transfer some customers to other Hog Slat sales representatives. In 2008, Prestage elected to build barns exclusively with Hog Slat. Hog Slat agrees that this was due, at least in part, to Myers' efforts. Hog Slat's projects for Prestage included hog barns that would be either (a) owned by Prestage itself or (b) owned and operated by Prestage's contract growers. During 2012, the number of Prestage barns built by Hog Slat increased significantly.

Myers understood that projects built for Prestage's contract growers did not count against the commission cap for Prestage itself. In 2008, Hog Slat included a contract grower's project in the Prestage commission cap but Myers disputed that inclusion. Hog Slat then agreed that the contract grower would not be included in the Prestage cap.

However, in 2012 Westfall developed some concern about the commission cap calculations. He apparently came to the conclusion that commissions on all Prestage projects, whether company-owned or grower-owned, should count toward the $100,000 Prestage cap. Westfall directed Richards to contact Myers and clarify the issue.

According to Hog Slat, Richards contacted Myers in July 2012 and advised him that Hog Slat intended to count contract growers toward the Prestage cap. Myers denies that this discussion took place. Instead, he states that he heard nothing about the cap issue until October 2012, when he talked to Richards and told him of his understanding that projects for con-

tract growers did not count toward the $100,000 Prestage cap. Myers contends that Richards responded by stating that he would have to think about the issue and promised to get back to Myers, but never did.

*Ava Myers.* Myers' daughter Ava was born October 14, 2008. Unfortunately, she has suffered from medical issues that started at a very early age. She had to be hospitalized at the University of Iowa in the fall of 2009 and again at the Mayo Clinic in December 2011. In the fall of 2009, she was diagnosed with a chromosome 22 micro duplication and was later diagnosed with a mitochondrial disorder. In January 2012, she became very ill and was admitted to St. Mary's Hospital in Rochester, Minnesota, due to bronchiolitis and RSV. She was ultimately transferred to the Pediatric Intensive Care Unit where she was placed on a ventilator to help her breathe. On March 21, 2012, Ava underwent surgery to remove her major salivary glands because she could not swallow correctly and was at a high risk for catching pneumonia. She was discharged from the hospital in April 2012.

As a result of her medical condition, Ava cannot walk, sit, run, eat, roll over or hold her head up on her own. Nor she can move without assistance. She cannot verbalize more than 10 words because of her low muscle tone. Thus, she communicates with her eyes, hands or a computerized communication device.

*Hog Slat's Health Insurance Plan.* In 2012, Ava Myers was insured under Hog Slat's health insurance plan, which was self-funded for up to $138,000 per year,

per participant. Hog Slat had a reinsurance policy through BlueCross BlueShield of North Carolina (BCBS) that entitled Hog Slat to be reimbursed for any claims over $138,000 per participant. There was also an aggregate cap on the amount Hog Slat would be required to pay out of its own pocket each year. In general, then, Hog Slat's health insurance expenses consisted of both (a) paying claims of up to $138,000 per participant and (b) paying a reinsurance premium to BCBS.

Denise Holland was Hog Slat's Director of Employee Healthcare during the relevant events. She first found out about Ava's disability during a phone call from Myers, who was at a doctor's office and told Holland that Ava had just received a disturbing diagnosis. He called to express concern about whether Hog Slat's insurance would cover Ava's disability. Based on this communication, Holland understood that Ava had very serious medical issues and would require substantial health care coverage.

In June 2012, Holland received a telephone call from BCBS alerting her that a significant claim—nearing $1 million—was about to appear on Hog Slat's bill. The representative told Holland that the claim was for Ava Myers. Holland had never received a call of this nature during her employment with Hog Slat. She sent an email message to Westfall, Hog Slat's CFO, to advise him that "we have a very high claim about to hit."[1] She explained that "we have a dependent child (one with MS[2]) that contracted a respiratory virus (RSV) and was hospitalized from 2/10—4/25." She also wrote that the child "went

---

1. While Hog Slat was entitled to reimbursement from BCBS for any claims in excess of $138,000 per participant, Hog Slat was required to pay those claims first. Thus, it was important for Westfall to know that a large claim was being processed.

2. In some communications, Ava's condition was described as "MS," presumably (and mistakenly) meaning multiple sclerosis.

home and was readmitted recently (and transported by life flight), so the issue isn't over yet." Ava's claim in June 2012 was the largest claim Hog Slat received at one time during Holland's employment. Holland knew at that time that Ava's medical issues were not over and that additional claims were going to continue to come in for her.

Westfall assumed that the "dependent child" at issue was Ava Myers, as he had some preexisting knowledge of her health situation. Hog Slat's health insurance plan had 601 participants during the 2012 plan year. The amount of claims for Myers and his dependents that year totaled $840,321.29, the highest of any participant. The next highest total of claims for an employee and that employee's dependents was $651,639.78. That particular employee exhausted paid disability leave and his employment with Hog Slat ended in January 2013, although the employee was able to continue coverage for some period of time pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA). The third-highest total for the 2012 benefit year $524,841.15. That employee also exhausted paid disability leave. His employment with Hog slat ended in September 2012 but he, too, was able to continue coverage for some period of time through COBRA.

On September 12, 2012, Hog Slat received a renewal proposal from BCBS for the 2013 benefit year. BCBS requested a 17.9 percent rate increase "based upon the leveraged trend and current health conditions." This proposed increase was the result of BCBS's review of Hog Slat's claims experience. In particular, Hog Slat's plan saw significant claims during 2011 and 2012, including the claims relating to Ava Myers.

The proposed increase was the highest Hog Slat had received during Holland's employment. The BCBS renewal notice contained an explanation that referenced certain large claims, including active claims in the amount of $775,084 for a claimant with "ACUTE BRONCHITIS DUE TO RSV" and "CHROMOSOME ANOMALY NOS." While the notice did not identify Ava Myers as the claimant, Hog Slat acknowledges that she was. The next-highest claim referenced in the renewal notice was for an active claim in the amount of $164,688, while three other claims that were referenced as being large claims ranged in size from $144,000 to $160,000.

The BCBS proposal also included a "laser" that essentially excluded Ava Myers from BCBS reinsurance coverage, instead shifting responsibility to Hog Slat for all of Ava's claims up to $1,500,000 before BCBS would begin reimbursing Hog Slat for those claims. One other participant was also selected for a laser. Holland testified that she was "shocked" by the proposed lasers. BCBS had never previously proposed lasers for any Hog Slat plan participants.

On or about October 15, 2012, BCBS sent Hog Slat a revised reinsurance renewal notice. The revised notice reduced the proposed rate increase to 9.5 percent, reduced the proposed laser for Ava Myers to $400,000 and added an additional proposed laser. Over the next several weeks, Hog Slat sought and obtained proposals from other insurers, which is its normal practice. Holland and Westfall had various communications about Hog Slat's health insurance rates, strategies to decrease Hog Slat's overall insurance costs, the reinsurance renewal notices issued by BCBS and issues arising from the large claims that were being submitted. Holland and Westfall were the only Hog Slat employees involved in negotiating the com-

pany's insurance rates during the fall of 2012.

On November 1, 2012, Hog Slat's insurance broker sent an email message to Holland and Westfall that included a spreadsheet summarizing various final reinsurance proposals. On November 6, 2012, Holland sent an email to Westfall asking that he make a decision on reinsurance for the upcoming plan year, which was set to begin December 1, 2012. Westfall responded to Holland that same day, stating that he had decided to switch from BCBS to SunLife for reinsurance coverage. Under the SunLife proposal, Hog Slat paid a higher premium for reinsurance in exchange for an aggregate specific cap of $350,000 and no lasers. Hog Slat's premium for the 2013 benefit year increased by approximately $173,540 over 2012. The premium Hog Slat paid to SunLife was approximately $100,000 higher than the premium BCBS had proposed.

*The Alleged Harassment.* Myers contends that Westfall's attitude toward him changed in June 2012, after Westfall learned of Ava's large claim. It is undisputed that at about this time, Westfall instructed Myers to bill Prestage for work on a weekly basis, rather than at various stages of the construction process. Myers complains that this new policy created a tremendous amount of additional work for him, making it more difficult for him to do his job. Hog Slat states that the new billing policy applied to all salespeople, not just Myers, and was in response to liquidity issues in the hog and poultry industry that made it imperative for Hog Slat to keep current with its customers on billings and collections.

Myers also contends that Westfall started "micromanaging" his projects and—as will be discussed further below—sought to change the interpretation of his per-customer commission cap. Myers claims

Westfall started contacting him once a week to discuss the status of projects and collections. Hog Slat notes, however, that 2012 was a very busy construction season, making it important for Westfall to keep tabs on such matters. Moreover, Hog Slat points out that Myers does not know if other salespeople experienced heightened scrutiny from Westfall during this period of time.

*The Fishing Trip.* In October 2012, another Hog Slat salesperson, Steve Poland, approached Myers about a fishing trip. The trip was sponsored by Automated Production (AP), a company that serves as a vendor to Hog Slat but that also sells certain feed system components in competition with Hog Slat. Poland told Myers that he knew AP did a fishing trip every year and thought they could get in on the trip that year.

Before going on the trip, Myers told his supervisor, Kenne, about it, noting that it was being paid for by AP and that Mark Hayden, an AP employee, would be present. Kenne responded: "Have fun." Kenne did not believe Myers' attendance at an AP-sponsored fishing trip was inconsistent with any Hog Slat policy. Bill Fulton, Hog Slat's Human Resources Manager, agreed. Hog Slat's National Sales Manager, Richards, learned about the trip either before Myers left or while the trip was in progress. He did not express any objection to the trip.

Westfall, the CFO, understood Hog Slat's policy regarding relations with vendors and customers to be that such trips had to be approved by a higher-level supervisor and could not be solicited by Hog Slat employees. Kenne was a higher-level supervisor for purposes of approving Myers' participation in this particular trip. Because Myers did not solicit the fishing trip with AP, and obtained approval from a higher-level supervisor prior to going on

the trip, Myers did not violate Hog Slat's policy.

By contrast, Poland did not obtain approval from a higher-level supervisor before going on the trip. Further, he violated Hog Slat's policy by soliciting the trip. He was verbally disciplined but is still employed by Hog Slat.

*The Invoices.* In June 2012, Myers was directed to invoice customers each week for work anticipated to be completed the following week. With regard to Prestage, this policy was designed to get invoices to Prestage by Monday so those invoices would be paid by the end of the week. Westfall testified that because of the financial condition of the hog and poultry industry in 2012, he considered it to be important for Hog Slat to stay current with its customers with regard to billings and collections. Westfall further considered Prestage to be subject to a high-level of scrutiny because it was such a large account.

During the AP fishing trip, Myers failed to send out invoices for the week to three customers: Prestage, Nelsen Brothers, and Ron DeVries. Myers delivered the invoices after returning from the trip. The total amount of the delayed invoices was approximately $500,000. Payment from Prestage to Hog Slat was delayed by about one week because Myers did not send out the invoices in a timely manner.

On November 2, 2012, Myers participated in a conference call with Poland, Westfall, and Richards. According to Myers and Richards, Westfall was angry during the call. Richards testified that Westfall did about 95 percent of the talking, spoke in a stern, loud voice and used a lot of expletives. Richards further testified that the fishing trip, not the delayed invoices, was the focus of Westfall's ire. Myers likewise testified that Westfall focused on the fishing trip, calling Poland and Myers "traitors" and referring to AP as "the enemy." While Myers understood the call to be a "pretty good butt chewing," nothing about the discussion caused him to be concerned that he might be fired. Nor did Richards hear anything during or after the call that caused him to believe Westfall might terminate Myers' employment. Indeed, Richards did not hear anything about a decision to fire Myers until the day of his discharge which, as will be discussed below, occurred over two months later.

On the same day the conference call took place, Richards sent an email to several Hog Slat employees reminding them of Hog Slat's policy regarding relations with vendors and customers. Richards did not send any similar reminders with regard to invoicing customers. However, other Hog Slat salespeople had issues with timely invoicing customers. Hog Slat acknowledges, at least for purposes of its pending motion, that some of these billing issues involved larger potential revenues than the invoices Myers failed to issue during his fishing trip, including projects with costs that significantly exceeded billings. One of these failures to bill resulted in costs to Hog Slat in excess of $1,805,744 with only $275,000 billed and paid. Westfall noticed this just five days after he allegedly made the decision to fire Myers because of his failure to invoice Prestage.

All of the salespeople who reported to Kenne had about the same track record when it came to timely invoicing customers. According to Kenne, getting salespeople to bill and collect was an ongoing issue with all of them. Kenne had conversations with the sales staff about these invoicing issues and knew that they were all were under pressure to collect money. He never considered terminating any of them, including Myers, due to any invoicing issues. Nor had either Richards or Kenne ever issued any form of written

discipline for failure to invoice in a timely manner.

On December 19, 2012, Westfall sent a text message to Poland, Myers and Richards that included a photo of a seal eating a fish and the following comment: "This is commonly know [sic] as An 'AP Seal,' favors a couple of guys I know in Iowa. These seals are trained in central Ill." Myers considered this to be a reminder from Westfall that they were not to go on trips with AP representatives again and believed it signified that Westfall was no longer angry, as he took the time to prepare and send a humorous text message.

**The Commissions Dispute and Proposed New Contract.** In mid-January 2013, Myers disagreed with the amount of commissions Hog Slat intended to pay him for the previous quarter because he did not believe that contract growers should be included in his $100,000 per customer commission cap for Prestage. Myers' position with regard to contract grower commissions was based on his compensation agreement and the fact that in 2008, contract growers were not included in his $100,000 per-customer commission cap for Prestage. Myers felt that his Agreement was unclear with regard to whether contract growers should be included in the per-customer commission cap. Hog Slat acknowledges that the parties had a legitimate dispute concerning the amount of commissions owed to Myers in January 2013.

On January 24, 2013, during the Iowa Pork Expo, Richards and Kenne met with Myers and presented him with a new proposed sales compensation agreement that expressly included contract growers in the per-customer commission cap. Myers had several questions about the proposed new contract. One question was whether Cargill contract-growers were included in the per-customer commission cap. Richards and Kenne stated they were not. Myers asked that this be put in writing. Another question was how Hog Slat intended to calculate a "year" under the agreement (*i.e.*, a construction year, a calendar year, or a fiscal year). Myers believed a year should be calculated as a construction year. Richards and Kenne responded that they could fix that in the contract as well. At the time Richards and Kenne presented Myers with the proposed new contract, neither of them had any intention of terminating Myers' employment later that week. If they intended to terminate his employment, they would not have given him a draft contract covering his employment going forward.

**The Termination.** On January 25, 2013, at 9:26 a.m., Myers sent an email to Richards, Kenne and Westfall regarding commissions. The email stated:

> The commission that was paid today is not the full amount to which I am entitled under our agreement. We have had several conversations over the last few days about this. The remaining amount is due and owing and needs to be deposited in my account by the end of the day.

> Further, commission payments are considered "wages" under Iowa law and any failure to pay me the entire amount that is due and owing violates Iowa's Wage Payment Collection Act and could subject the company to significant liability.

Richards went to Westfall's office shortly after receiving Myers' email. Westfall told Richards to terminate Myers' employment. He also told Richards to recalculate Myers' commission payment according to Myers' interpretation of the Agreement, meaning contract growers would not count against the Prestage cap. Under that interpretation, Hog Slat determined that Myers would be entitled to additional commissions totaling $66,599.00. Westfall told

Fulton, Hog Slat's Human Resources Manager, to make arrangements to get that disputed amount to the Iowa office that day.

Myers testified that within ten minutes of sending his email message, his company email stopped working and he was locked out of the Hog Slat accounting system. Richards and Fulton contacted Kenne on January 25 and instructed him to fire Myers but did not provide any reason. They told Kenne that they would be sending him forms and a check to deliver to Myers. Kenne testified that the termination did not make sense to him, although he acknowledged that this is simply his opinion and it was not for him to decide.

Within about ninety minutes after sending the January 25, 2013, email message, Myers received a call from Kenne informing him that they needed to meet at a neutral location, and that Myers needed to bring all of his Hog Slat belongings with him. When Myers and Kenne met, Kenne said: "This isn't what I wanted to do today." Kenne then advised Myers that his employment was terminated and showed him various forms and a check made payable to Myers. One form indicated that Myers was being paid a lump sum severance in the gross amount of $66,599, representing the "amount employee feels he is owed as commission and Hog Slat disagrees." The check was in the net amount of $37,277.23, and noted that it was for "commission." Myers understood the check to be a severance payment, not payment for the full amount of the disputed commissions, and ultimately deposited it.

Myers had never been fired from a job before. Nor had Hog Slat ever previously fired a salesperson for failing to send out invoices. According to Westfall, he decided to terminate Myers' employment on November 2, 2012, the date of the conference call. He states that he made this decision because of the fishing trip and because Myers did not bill Prestage during that trip. He testified that there were no other reasons for the decision and that the decision was made before lunch on November 2, 2012. He further testified that he kept this decision to himself until January 25, 2013, and that he delayed notifying Myers of the decision because it was a very busy time, as Hog Slat was trying to get projects started before winter, and terminating Myers at that point would have been a disservice to Hog Slat's customers.

*The Handbook.* Hog Slat's employee handbook contained a Progressive Discipline Policy stating, in relevant part: "Disciplinary action usually occurs in a progressive sequence: verbal warning, written warning, final written warning, and discharge." The policy also stated that violations of "Category I rules" can result in "immediate termination." It is undisputed that Myers did not receive any written discipline during his employment with Hog Slat for any performance issues related to invoicing. Westfall testified, however, that he deemed Myers' delay in getting invoices to Prestage because of the AP fishing trip to be "gross insubordination," a Category I rule violation. The policy defined "gross insubordination" as the "refusal or failure to carry out an instruction from a supervisor, manager or Company official or; improper conduct or defiance directed towards a supervisor, manager or official." According to Westfall, progressive discipline was not required under these circumstances.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed.R.Civ.P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A material fact is one that " 'might affect the outcome of the suit under the governing law.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), or when " 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir.2005) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, or evidence that is "merely colorable" or "not significantly probative," *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 784 (8th Cir.2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376–77 (8th Cir.1996).

■ No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment

motions).[3] However, as Judge Bennett recently explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners,* 831 F.2d 690, 697–98 (7th Cir.1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC,* 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen,* No. C13–4041, 2014 WL 4258738, at *12 (N.D.Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evi-

---

**3.** Myers cites various cases declaring summary judgment to be a "drastic remedy" that should "seldom" be used in employment discrimination cases. Doc. No. 23–1 at 12–13. In light of *Torgerson,* those cases are no longer good law.

dence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].' " *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir.2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336–37 (8th Cir.1996)).

## V. ANALYSIS

As noted above, the only two counts at issue with regard to Hog Slat's motion are Count I (associational discrimination in violation of the ADA) and Count II (interference with employee benefits in violation of ERISA). Hog Slat does not seek entry of summary judgment on Count IV and Myers does not resist entry of summary judgment on Counts III and V.

■■■■ Simplifying matters further, the parties agree that the essential elements of Counts I and II are very similar. Under the ADA, it is unlawful to discriminate against an employee because of his or her association with a person with a disability. 42 U.S.C. § 12112(b)(4). This provision prohibits discrimination against an employee due to expenses arising from a family member's disability. *See, e.g., Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 700 (7th Cir.2004). Federal courts apply a *McDonnell Douglas* burden-shifting analysis[4] to such claims. *See, e.g., Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir.2011); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir.1997). Myers must first establish a prima facie case of discrimination by showing: (1) he was qualified for his position, (2) he was subject to an adverse employment action, (3) he was known to be

associated with a disabled individual, and (4) his discharge occurred under circumstances raising a reasonable inference that his association with a disabled individual was a determining factor in Hog Slat's decision to fire him. If he does, then the burden shifts to Hog Slat to proffer a legitimate, nondiscriminatory reason for the discharge. *Den Hartog*, 129 F.3d at 1085. If such a reason is proffered, the burden shifts back to Myers to show that the stated reason is pretextual. *Id.*

■■■ Under ERISA, it is unlawful for an employer to discharge or discriminate against an ERISA plan participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. To establish a prima facie case, he must show: (1) he was subjected to adverse employment action, (2) he was likely to receive future benefits, and (3) a causal connection between the adverse employment action and the likelihood of future benefits. *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1043–44 (8th Cir.2010). Moreover, Myers must prove that Hog Slat possessed "a specific intent to interfere" with those benefits. *Id.* at 1044 (quoting *Pendleton v. QuikTrip Corp.*, 567 F.3d 988, 992 (8th Cir.2009)).

If Myers establishes a prima facie case, the burden would shift to Hog Slat to provide a legitimate, nondiscriminatory reason for his discharge. *Id.* At that point, the burden would shift back to Myers to demonstrate that this reason is pretextual. *Id.* Thus, while the elements of these two claims are not identical, the elements at issue for purposes of Hog Slat's motion for summary judgment are

---

4. This analysis derives from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It applies when there is no direct evidence of discrimination. *See, e.g., Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996 (8th Cir.2014). Here, Myers does not contend that the record contains direct evidence and, instead, agrees that the burden-shifting framework applies. Doc. No. 23–1 at 14–15.

aligned. With regard to both claims, Myers must establish a prima facie case by, *inter alia*, showing that reasonable jurors could find a causal connection between his discharge and the costs to Hog Slat arising from Ava's disability. If he does, he must also establish that reasonable jurors could find Hog Slat's stated nondiscriminatory reason for his discharge to be pretextual. I will address these issues sequentially.

### 1. *Causal Connection*

■ In employment discrimination and retaliation claims, a temporal connection between an event and an adverse employment action can serve as evidence supporting a prima facie showing of causation. *See, e.g., EEOC v. Product Fabricators, Inc.*, 763 F.3d 963, 969–70 (8th Cir.2014) (citing *Lors v. Dean,* 746 F.3d 857, 866 (8th Cir.2014)). At the same time, however, timing *alone* is not adequate to establish causation unless the timing is "very close," usually meaning less than one month. *Lors,* 746 F.3d at 865–66; *see also Sisk v. Picture.People, Inc.*, 669 F.3d 896, 900–01 (8th Cir.2012). Thus, for example, the Eighth Circuit Court of Appeals has found that a discharge occurring within two weeks of a protected action was "barely" sufficient to establish causation for purposes of a prima facie case. *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833 (8th Cir.2002). The court noted that under the *McDonnell Douglas* framework, only a "minimal showing" is required in order to establish a prima facie case. *Id.*

■ Here, in considering the timing of the relevant events and other evidence bearing on the issue of causation, I conclude that reasonable jurors could find a causal connection between Myers' discharge and his daughter's health condition. This does not mean, of course, that such a connection actually existed. It simply means that the issue is for the jury, not the court, to decide.

For starters, there is no dispute that the total amount of Ava's medical claims during 2012 was extraordinary. As noted above, the claim presented to Hog Slat in June 2012 was the highest single claim the company had received during Holland's employment (which, by that time, included about five years). The claim was so large that BCBS gave advance warning to Holland to make sure Hog Slat had sufficient available funds to pay it. Holland had never before received a call of that nature. Ultimately, and largely because of Ava's condition, Myers and his dependents generated claims during the 2012 plan year of more than $840,000, a sum that exceeded the next highest total by nearly $200,000.

The jury could also find, easily, that Ava's claims in 2012 had a significant impact on Hog Slat's reinsurance renewal premium. In September 2012, Hog Slat received notice from BCBS that its reinsurance premium would be increased by 17.9 percent for the next plan year, based largely on claims experience. This was the highest proposed increase Hog Slat received during Holland's employment. Moreover, the proposal included a "laser" under which Hog Slat would be responsible for the first $1.5 million in claims relating to Ava. Thus, the proposal not only included a substantially-higher premium, it also increased Hog Slat's exposure to Ava's medical claims by over $1.3 million.

This was the first time BCBS had ever proposed lasering a claimant. The concept "shocked" Holland. While BCBS revised its proposal in October, reducing the premium increase to 9.5 percent and reducing Ava's proposed laser to $400,000, Hog Slat still faced a substantial increase in its health plan expenses, with Ava's claims being a significant, contributing factor. Of course, instead of staying with BCBS, Hog

Slat sought alternative options, ultimately accepting a competing proposal from Sun-Life. With SunLife, Hog Slat's premium expense increased by over $173,540 from the prior year and Hog Slat took on a $350,000 aggregate specific deductible that was not part of its prior coverage.[5]

Hog Slat points out that one of the reasons it chose the SunLife plan was to avoid having certain participants, such as Ava, subjected to lasers. The jury may very well find that this weighs in Hog Slat's favor. However, there is no doubt that Ava's medical condition is a primary reason why Hog Slat found itself in this situation to begin with. The claims Ava generated in 2012 were not simply high— they were (at least based on the current record) unprecedented.

Reasonable jurors could also find Hog Slat understood that this high level of claims was not an isolated, one-time occurrence. Ava turned four years old during 2012. When Myers was first advised of Ava's diagnosis, he contacted Holland to tell her about it and to make sure the Hog Slat health insurance plan would provide coverage. Holland understood from this call that Ava had serious medical issues that would require substantial health coverage. Holland later arranged to have a BCBS case manager assigned to Myers because of the nature of Ava's claims.

When BCBS notified Holland in June 2012 that a large claim was coming, Holland passed the information onto Westfall. Westfall assumed, correctly, that the claim related to Ava. Earlier in the year, Richards had forwarded to Westfall an email message Myers had sent about Ava's condition. Given the knowledge Holland and Westfall had about Ava's condition, the jury could find they anticipated that she may continue to require substantial levels of medical care. Viewing the record most favorably to Myers, Holland and Westfall could have perceived Ava as a plan participant who would expose Hog Slat to a very high level of claims, year after year, so long as Myers remained employed at Hog Slat and the company maintained a group health plan.[6]

Reasonable jurors could also find that Westfall was bothered by this development. According to Myers, Westfall's attitude toward him changed significantly in June 2012. Myers has testified that before June 2012, months would pass without contact from Westfall. Beginning in June, however, he states that Westfall began contacting him on a weekly basis and placed him under increased scrutiny as to projects and collections. He further complains that Westfall made sudden changes to billing procedures with regard to Prestage that created substantial additional work for Myers. It was also during this time period that Westfall began raising issues about including commissions for contract growers in Myers' $100,000 commission cap for Prestage. While Hog Slat points out that 2012 was a busy construction season, thus making increased communications and scrutiny understandable,

5. In its reply, Hog Slat cites various statistics in an effort to show that the financial impact of Ava's claims was not as severe as Myers portrays. Doc. No. 29 at 4–5. While Hog Slat's numbers may very well be accurate, they are for the jury to consider, not the court. Myers has demonstrated that Ava's claims during 2012 were extremely high, that they caused Hog Slat's reinsurance premium for the following year to increase substantially and that Hog Slat had information suggesting

Ava would continue to present high claims in the future. For purposes of a motion for summary judgment, the precise impact of Ava's claims in 2012 is not determinative.

6. In general, plans and issuers offering dependent coverage must make that coverage available until a child reaches the age of 26. 42 U.S.C. § 300gg–14(a).

the jury is not required to accept that explanation. Myers' testimony, if believed, could support a finding that Westfall became hostile towards him after being advised of Ava's large claim in June.[7]

Moreover, the events and decisions that led to Myers' discharge occurred while Hog Slat was in the process of discovering and dealing with the prospective effects of Ava's claims. The fishing trip, and Myers' resulting delay in issuing invoices, took place in October 2012. This was just over a month after Hog Slat received BCBS's initial reinsurance proposal for the 2013 plan year. On November 1, 2012, Hog Slat received an email message from its insurance broker summarizing the various reinsurance options. That evening, Westfall told Richards to set up a conference call the following day to discuss the fishing trip. By noon on November 2, 2012, Westfall had decided to terminate Myers' employment after nearly fourteen years of service.

Westfall and Holland were the only Hog Slat employees involved with the company's reinsurance renewal efforts. Myers did not report to Westfall. Westfall did not consult with Kenne, who was Myers' direct supervisor, or Richards, the company's National Sales Manager, before making the decision. Instead, and acting entirely on his own, one of the two people in the company with knowledge of the financial impact of Ava's medical claims made the decision to end Myers' employment.

On this record, I cannot find as a matter of law that there was no causal connection between Ava's condition and Myers' discharge. Reasonable jurors could find that Westfall, as Hog Slat's Chief Financial Officer, made the decision to terminate Myers' employment because of the current and future financial impact of Ava's ongoing medical issues. Of course, reasonable jurors could also make the opposite finding. The issue of whether Myers can establish a prima facie case of causation, for purposes of his ADA and ERISA claims, cannot be determined as a matter of law.

### 2. Pretext

As noted earlier, the fact that a plaintiff can establish a prima facie case of discrimination does not end the analysis. Instead, it simply shifts the burden to the employer to provide a legitimate, non-discriminatory explanation for the adverse action. Once the employer does so, the plaintiff must present evidence that (1) creates a question of fact as to whether the employer's proffered reason was pretextual and (2) creates a reasonable inference that the employer acted with discriminatory intent. See, e.g., Smith, 302 F.3d at 833. If there is a genuine factual controversy as to whether Hog Slat's discharge decision was motivated, in whole or in part, by Ava's disability, then summary judgment is not appropriate. Strate, 398 F.3d at 1019.

A plaintiff shows pretext by "adducing enough admissible evidence to raise genuine doubt as to the legitimacy of [the defendant's] motive." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th

---

**7.** Myers' testimony concerning Westfall's alleged conduct would not come close to supporting a claim for discrimination in the form of a hostile work environment, as such a claim requires evidence that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 550 (8th Cir.2007). However, on the issue of whether a causal connection exists between Ava's claim and Westfall's subsequent decision to discharge Myers, evidence that Westfall began treating Myers differently after learning the magnitude of the claim is clearly relevant.

Cir.2010). The Eighth Circuit Court of Appeals has explained:

"A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake [v. Yellow Transp., Inc.,* 596 F.3d [871,] 874 (8th Cir.2010). "We have observed that there are 'at least two routes' for demonstrating a material question of fact as to pretext." *Anderson,* 606 F.3d at 521 (citing *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1120 (8th Cir.2006)). "First, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact. Second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Id.* (internal quotation marks omitted).

*Gibson v. American Greetings Corp.,* 670 F.3d 844, 854 (8th Cir.2012).

■ Here, Hog Slat describes its reason for discharging Myers as "his violations of company billing practices, including his undisputed failure to invoice a customer while on a fishing trip with a competitor and vendor of Hog Slat." Doc. No. 19–1 at 17. Viewing the record most favorable to Myers, I have no trouble concluding that genuine issues of material fact exist as to whether this stated reason is pretextual. Reasonable jurors could find that the evidence gives rise to an inference that Hog Slat acted with discriminatory motive.

First, for purposes of Hog Slat's motion it is undisputed that Myers was a long-time, high-performing employee at the time Hog Slat learned of Ava's condition. As of the fall of 2012, Myers had been employed by Hog Slat for fourteen years and was the most productive of the seven salesmen who reported to Kenne. Kenne

considered Myers' work performance to be the best of the seven. He never gave Myers a poor performance evaluation and Myers exceeded his expectations as a salesperson. While a strong employment history will not, alone, create a genuine issue of material fact concerning pretext, it is relevant evidence. *Strate,* 398 F.3d at 1020.

Second, the jury could find that Hog Slat failed to follow its own policies with regard to Myers. Hog Slat's employee handbook states that disciplinary action "usually occurs in a progressive sequence: verbal warning, written warning, final written warning, and discharge." Here, it is undisputed that Hog Slat skipped the various "warning" steps. Hog Slat states that this is because Westfall deemed Myers' conduct to be "gross insubordination" that justified "immediate termination" pursuant to the handbook. This could very well be true. However, it is not true *as a matter of law.* For example, reasonable jurors may very well find it odd that "immediate termination" was not carried out for over two months. There is a genuine issue of material fact as to whether Hog Slat complied with its own policies in discharging Myers.

Third, the record contains evidence from which reasonable jurors could find that Hog Slat treated Myers more harshly than it treated similarly-situated employees. At the pretext stage, the test for whether other employees are "similarly situated" is "rigorous." *See, e.g., Wheeler v. Aventis Pharm.,* 360 F.3d 853, 857 (8th Cir.2004). Here, Hog Slat contends that two facts, in combination, caused Myers' discharge: (1) Myers delayed issuing invoices to Prestage and (2) Myers went on a vendor-sponsored fishing trip. For purposes of Hog Slat's motion, it is undisputed that neither fact, standing alone, has caused any similarly-situated employee to be discharged. With regard to his admitted delay in sending

invoices, Hog Slat admits that no other salesperson has been fired for failing to send out invoices. Moreover, Hog Slat acknowledges that other salespeople have committed more-significant billing transgressions without being discharged. One incident resulted in costs to Hog Slat in excess of $1,805,744 with only $275,000 being billed and paid. By contrast, Myers' short delay caused Hog Slat to receive payment from Prestage about one week late, with all invoices being paid in full.

As for the fishing trip, Myers has produced evidence that his participation in the trip did not violate any Hog Slat policy. It is undisputed that Myers discussed the trip with his immediately supervisor, Kenne, before attending, and that Kenne told him to "have fun." Kenne considered the trip to be a non-event and does not believe that it violated any Hog Slat policy. Hog Slat's Human Resources Manager, Bill Fulton, agrees. Meanwhile, Steve Poland, the salesperson who went on the trip with Myers, violated Hog Slat's policy by soliciting the trip from AP, a vendor. Poland also failed to obtain approval from Kenne, his supervisor, for the trip. Despite these violations, Poland was not discharged.

Thus, when the two stated reasons are considered independently, the jury could easily find that similarly-situated employees who engaged in comparable, or even more harmful, conduct were not treated as harshly as Myers. Hog Slat argues, however, Myers' situation is different because the two stated reasons happened *together*. That is, Myers not only went on the trip, but failed to send invoices while he was on the trip. Thus, according to Hog Slat, Myers was not treated more harshly than similarly-situated employees because no other employee ever engaged in this precise combination of conduct.

For purposes of considering Hog Slat's summary judgment motion, I reject this argument. Because the jury could find

that Myers' participation in the fishing trip was not a violation of company policy, it could conclude that Hog Slat did not actually consider that trip to be an aggravating factor requiring discharge. Indeed, viewing the evidence most favorably to Myers, Hog Slat's stated position could be viewed in the same light as an observation that no other salesperson delayed sending out invoices while also owning a blue car. Because it is undisputed that no other salesperson was discharged for failing to send out invoices, the jury is entitled to find that Myers was treated more harshly than similarly situated employees.

Fourth, the jury could find that other circumstances surrounding Myers' discharge are suspicious. Hog Slat's position is that Westfall made the decision to terminate Myers' employment on November 2, 2012, but told no one in the company about that decision for over two months. Neither Myers' immediate supervisor nor the company's National Sales Manager were told that a high-performing salesperson was about to be discharged. As a result, those employees proceeded as if all was normal, even going so far as to begin negotiations with Myers for a new compensation agreement. Kenne, as Myers' supervisor, felt that the termination made no sense.

As noted earlier, Westfall was one of just two people at Hog Slat with direct knowledge of Ava's large medical claim and the increased reinsurance expenses the company was facing for the upcoming plan year. The jury could consider it unusual that the company's Chief Financial Officer, to whom Myers did not report, would make the decision to discharge a salesperson—especially in light of the timing. All of these circumstances could cause reasonable jurors to conclude that Hog Slat's stated reasons for discharge are pretextual and that Hog Slat instead acted with discriminatory intent.

Because genuine issues of material fact exist on the issue of pretext, summary judgment is not appropriate on Myers' claims under the ADA and ERISA.

## VI. CONCLUSION

For the reasons set forth herein, defendant's motion (Doc. No. 19) for partial summary judgment is **granted in part** and **denied in part,** as follows:

1. The motion is **granted** as to Count III (violation of the Iowa Wage Payment Collection Act) and Count V (breach of contract). Those two claims are hereby **dismissed** from this case.

2. The motion is **denied** with regard to Count I (associational discrimination in violation of the ADA) and Count II (interference with employee benefits in violation of ERISA).

3. The jury trial of this case will proceed as scheduled, beginning December 8, 2014, on Counts I, II and IV.

**IT IS SO ORDERED.**